UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

      Plaintiff,

v.                                                      **MEMORANDUM OPINION
                                                        AND ORDER**
                                                        Crim. No. 09-352 (MJD)

Omer Abdi Mohamed,

      Defendant.
_____

      William M. Narus, Trial Attorney, Department of Justice and John R. Marti, First Assistant United States Attorney, Counsel for Plaintiff.

      Peter B. Wold and Aaron J. Morrison, Peter B. Wold, P.A., Counsel for Defendant.
_____

This matter is before the Court on the Petition to Revoke the Defendant's release pending sentencing.

**I.    Background**

The Defendant was charged by Superseding Indictment with conspiracy to provide material support to terrorists, providing material support to terrorists, conspiracy to murder, kidnap, maim and injure and three counts of possessing a firearm during a crime of violence. After he was initially indicted in 2009, the

Defendant had been released on an unsecured bond with conditions, such as not committing any crimes, reporting to probation as directed, make all court appearances, surrender his passport and be subject to electronic monitoring. (Doc. No. 3.)

On July 18, 2011, the Defendant entered into a Plea Agreement by which he pleaded guilty to Count 1 of the Superseding Indictment which charged conspiracy to provide material support and resources to be used to carry out a violation of 18 U.S.C. § 956 (a)(1) (conspiracy to kill, kidnap or maim persons in a foreign country) all in violation of 18 U.SC. § 2339A.

After his guilty plea, the Court allowed the Defendant to remain on release pursuant to the conditions previously imposed. A new probation officer was assigned to work with the Defendant, and she requested that the Defendant meet with her to discuss his conditions of release. At that meeting, the Defendant was again advised of the conditions of release imposed. In addition, the Defendant was directed to contact the probation officer by telephone once a week, and was informed that probation would conduct a random home visit at the Defendant's home once per month. The Defendant was presented with a form entitled "Pretrial Release Reporting Instructions," which included the condition that the

Defendant is to "Notify your probation officer immediately of any change in address, telephone or employment." (Government Ex. 3.) The form further provides the following "Defendant's Statement" - "I understand the above-stated instructions and understand that failure to comply will be reported to the Court and may result in the revocation of my bond and my detention pending the outcome of my case." (<u>Id.</u>) The Defendant signed and dated this form on November 17, 2011. (<u>Id.</u>) The Defendant was also provided a copy of this form to take home.

While on release pending sentencing, another defendant, Mahamud Said Omar, was tried on charges related to the charge to which the Defendant pleaded guilty. During Omar's trial, multiple witnesses testified to this Defendant's role in the charged conspiracy. Specifically, co-conspirator Kamal Said Hassan testified that the Defendant was a leader of the group that arranged the travel of several young men to Somalia in 2007. (Excerpt Trial Testimony of Kamal Said Hassan at 14.) The Defendant preached to the travelers, and provided a lecture by Anwar al-Awlaki entitled "Constants on the Path to Jihad." (<u>Id.</u> at 35-36.) Hassan further testified that the Defendant provided him a false itinerary in order to get his passport from his father and to obtain a ticket to travel to

Somalia. (Id. at 45-48.) Finally, Hassan testified that the Defendant convinced Shirwa Ahmed, who eventually participated in a suicide bombing, to leave Saudi Arabia and join other men in Somalia. (Id. at 65.)

Another co-conspirator, Salah Osman Ahmed, testified that the Defendant was present at multiple meetings during which travel plans to Somalia were discussed. (Excerpt Trial Testimony of Salah Osman Ahmed at 177.) Ahmed also testified that the Defendant ranked above him and Hassan in the conspiracy. (Id. at 172.) Co-conspirator Abdifatah Yusuf Isse similarly testified that the Defendant had a leadership role in the conspiracy. (Excerpt Trial Testimony of Abdifatah Yusuf Isse at 115.)

Finally, another witness at the Omar trial, Ahmed Hussein Mahamud testified that he met the Defendant in March 2011 and that Mahamud knew him to be a supporter of al-Shabaab or a "brother." (Excerpt Trial Testimony of Ahmed Hussein Mahamud at 100.) Mahamud further testified that an individual named Yassin introduced him to the Defendant, and that Yassin was the same individual who introduced Mahamud to "Farhan" and "Adaki"; two individuals who later traveled to Somalia to join al-Shabaab. (Id. at 80-83.)

4

## II. Petition to Revoke Release

On October 19, 2012, the probation office filed a petition requesting the Court issue a warrant for Defendant's arrest based on the following violation of his conditions of release: "Providing materially false information to the supervising U.S. Probation Office regarding employment." (Doc. No. 126). A warrant was issued and the Defendant arrested. The Defendant was held in custody pending an evidentiary hearing, which hearing was held on October 24, 2012.

At the hearing, the government presented testimony from probation officer Krystal Taylor. Taylor testified that she was assigned to supervise the Defendant in October 2011, and that she arranged a meeting with the Defendant in November 2011. At that meeting, the Defendant told her that he was unemployed, and was staying at home to take care of his young children.

During a home visit on July 31, 2012, the Defendant, for the first time, informed Taylor that he was a volunteer at the Essential Learning of Minnesota Institute ("ELMI"). He described his role as a teaching assistant. After learning of his involvement with ELMI, Taylor drove to the building housing ELMI and observed a number of children and parents entering and leaving the building.

5

Taylor testified that from this visit, until the petition was filed on October 19, 2012, the Defendant did not inform her of any changes in his employment status or his role at ELMI.

Taylor testified that during a home visit conducted on October 18, 2012, she informed the Defendant that his curfew was going to change, requiring him to be home by 10:00 p.m. Previously, his curfew was set at 2:00 a.m to 4:00 a.m.; a schedule that allowed him to attend prayer services. The Defendant objected to the change because he had just started a consulting business, which required him to travel all over the state of Minnesota. The Defendant then showed her paperwork connected with the business, including a licensing form dated sometime in October. Taylor testified that prior to this visit, the Defendant had not mentioned the fact that he was planning on starting a business.

Taylor then reviewed reports of interviews of individuals associated with ELMI. After reviewing the reports, Taylor noticed inconsistencies in the information provided her by the Defendant as to his role at ELMI. The reports of interviews indicated that the Defendant had more of a leadership or director role at the school, and that the Defendant was involved in raising money for the school. This raised concern for Taylor, for a probation officer needs to be aware

of the Defendant's activities while on release in order to properly assess risks to third parties. Given the fact that the Defendant had entered a plea of guilty to the charge of conspiracy to provide material support to terrorists, his actual role at a school for young children was very important to her ability to properly supervise the Defendant.

With respect to the reports of interviews of persons associated with ELMI, the government presented testimony from Special Agent Uri Rosenwald of the FBI. Rosenwald testified that an interview was conducted by the FBI with an individual identified as "Parent No. 1." Parent No. 1 told the FBI that Parent No. 1's daughter attended ELMI and that the daughter had begun to distance herself from her family. Parent No. 1 further stated the daughter changed her clothing from jeans and a head scarf to more traditional religious garb, including covering her face fully at all times. Parent No. 1 reported that on May 6, 2012, Parent No. 1 received a telephone call from someone named "Ahmed" and that Ahmed told Parent No. 1 that Parent No. 1's daughter was being held at the school and the Quran was being read over her. During the interview, Parent No. 1 was shown a photograph of the Defendant, who identified the Defendant as the director of ELMI.

7

Parent No. 1 further reported that after receiving the phone call from Ahmed, the daughter's brother and uncle went to ELMI. There, they met with the Defendant who informed them that he had been texting the daughter, and that she had responded by text that she was okay.

During a second interview of Parent No. 1, Parent No. 1 discussed the topic of "Jinn" which was described as a religious practice to rid one of evil spirits. Parent No. 1 also reported that Parent No. 1 met with the Defendant at ELMI, who attempted to calm Parent No. 1 concerning the daughter. Parent No. 1 was then lead by the Defendant and Ahmed to a room, locked the door and explained that the daughter was not well and the ELMI's spiritual leader was reading the Quran over her. Ahmed further explained that the daughter was not tied down, but was held down tightly. During this meeting, Parent No. 1 was persuaded to leave the school. Later, Parent No. 1 called the school and challenged the decision to read the Quran over the child.

During an interview of Parent No. 2, Parent No. 2 reported familiarity with Mohamed Osman; that Osman attended classes at ELMI and taught there for a period of three months. Parent No. 2 reported that Osman had called Parent No. 2 in August 2012, and reported that Osman was in Kenya. Parent No. 2 indicated

that it was Parent No. 2's impression that Osman was in Somalia and that he was there to fight. Parent No. 2 further reported that Osman had worshiped at Aubakar As-Saddique mosque and at the Karmel Mall mosque.

Another parent, identified as Parent No. 4, further informed FBI agents that the Defendant was a director or leader at ELMI, and that the Defendant had accepted Parent No. 4's payments for the school.

Rosenwald then testified about an interview with an individual referred to as Adult No. 1, who reported that another individual named Omar Ali Farah had left the United States, and that Farah had telephoned family members to inform them that he was in Marka, Somalia, and that he was there with "those that kill people." Adult No. 1 also reported that Farah taught dugsi at an Islamic school.

Rosenwald further testified that the FBI searched passenger name records ("PNR") for flights and determined that Osman and Farah both left Minnesota on different flights, but on the same day, July 18, 2012. (Government Exs. 7 and 8.) The PNRs indicated return flights for both Osman and Farah on August 23, 2012, but upon further investigation by the FBI, it has been determined that neither men have returned to the United States.

9

At the evidentiary hearing, the Defendant presented the testimony of William O'Keefe. O'Keefe is a private investigator who was asked by defense counsel to visit the ELMI site. O'Keefe did so, and took pictures inside the school. O'Keefe testified that while at ELMI, he observed Somali youth working on homework and other educational assignments.

The Defendant also presented the testimony of Abdulcadir Haji, a parent whose children, ages 6, 8 and 10 attend ELMI. He testified as to his and his children's experiences at ELMI, and that all such experiences were positive. He further testified that he was familiar with the Defendant, and believed that the Defendant was a parent liaison or coordinator. Haji testified that he did not believe Defendant was a director of the school. Haji further testified that the executive director of the school, Awil Berbera, had been in the courtroom earlier, but had since left.

**STANDARD**

Pursuant to 18 U.S.C. § 3143 (a), a person convicted of a crime shall be detained pending sentencing unless the court finds by clear and convincing evidence that the Defendant does not pose a flight risk or is a danger to the safety of another person or the community. Under section 3143, it is the Defendant's

burden to establish by clear and convincing evidence that he does not pose a danger to the safety of any person or the community. See United States v. Wesland, 993 F.2d 1366, 1367 (8th Cir. 1993).

Revocation of an order for release pending sentencing is governed by 18 U.S.C. § 3148(b), which provides that a court shall enter a detention order if it finds a violation of conditions of release and it finds no condition or combination of conditions of release will assure the court that the Defendant does not pose a danger to the safety of any other person or the community if allowed to remain on release. Wesland, 993 F.2d at 1367.

Based on the file, records and proceedings herein, the Court finds that the Defendant has violated a condition of his release pending sentencing, and that the Defendant has failed to establish that there exists a condition or combination of conditions that will assure the Court that the Defendant does not pose a danger to the safety of another person or the community.

As established at the evidentiary hearing, the Defendant was informed by his probation officer Krystal Taylor on November 17, 2011 that he was to notify her of any change in his employment status and that failure to do so could result in the revocation of his release. The government thereafter put forth a sufficient

11

proffer establishing that the Defendant had a leadership or director role at ELMI, and that he had participated or was aware of a "jinn" performed at the school over one of the students. Given this evidence, the Court finds it telling that the executive director of ELMI was present in the courtroom during the hearing, but was not called to testify in support of Defendant's claim that he was a mere volunteer at the school.

Taylor testified that the Defendant did not inform her of his true role at ELMI, nor did he inform Taylor of his plans to start a consulting business, and only informed her of such business when told that his curfew would be changed. Based on the evidence presented, the Court finds that the Defendant did violate the condition of his release requiring him to notify his probation officer of any changes in his employment status.

The government also presented a sufficient proffer establishing that the Defendant, by virtue of his involvement with ELMI, poses a danger to the safety of another person or the community if allowed to remain on release pending sentencing. As set forth above, the Defendant has entered a guilty plea to the charge of conspiracy to provide material support or resources to a terrorist. This Court heard testimony during the trial of Mahamud Omar that described this

Defendant's role in that conspiracy - that he had a leadership role and provided religious teachings to young men who traveled, and in some cases were killed, in Somalia, and that he directly facilitated the travel of one co-conspirator by obtaining a false itinerary to present to the co-conspirator's father. The government's proffer with respect to the activities connected with ELMI, and the Defendant's involvement with ELMI, demonstrates that the Defendant may be involved with or connected to continued attempts to facilitate the travel of young men from Minnesota to Somalia to fight with terrorist groups.

It is the Defendant's burden to demonstrate to the Court that there exists a condition or combination of conditions that will assure no danger to the safety of another person or the community if the Defendant is released. See Wesland, 993 F.2d at 1367. The Defendant did not meet this burden. Accordingly,

**IT IS HEREBY ORDERED** that the Defendant's Release Pending Sentencing is **REVOKED**. The Defendant shall remain in the custody of the U.S. Marshal pending sentencing.

Date:   October 25, 2012

                                    s/ Michael J. Davis
                                    Michael J. Davis
                                    Chief Judge
                                    United States District Court