UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>OMER ABDI MOHAMED,<br><br>Defendant. | CR. NO.: 09-352 (MJD)<br><br>**POSITION OF DEFENDANT OMER MOHAMED WITH RESPECT TO SENTENCING** |

Defendant, Omer Abdi Mohamed, by and through his attorneys, submits this position pleading in support of a sentence of no more than 60 months. Mr. Mohamed asks this Court to grant a downward variance to a sentence of no more than 60 months.

### I. THE TERRORISM ENHANCEMENT DOES NOT APPLY TO OMER MOHAMED.

The Presentence Report's guideline calculation includes a victim related adjustment pursuant to §3A1.4(a), "because the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." (PSR at ¶102). As this Court is aware, application of the terrorism enhancement dramatically alters Mr. Mohamed's guidelines; providing a twelve level increase to the guideline calculation and an automatic criminal history category of VI. U.S.S.G §3A1.4(a). Presentence Report's justification for the inclusion of the terrorism enhancement appears to rest solely on the fact that because Mr. Mohamed's offense conviction is enumerated as a federal crime of terrorism by 18 U.S.C. §2332b(g)(5). (PSR at ¶102). But, a closer look at the statue and

1

enhancement reveals a second element must also be present before the enhancement can be applied: specific intent.

Mr. Mohamed submits, in order for the terrorism enhancement to apply, the offense must be (1) an enumerated felony that (2) was intended to promote a federal crime of terrorism. In other words, for the terrorism enhancement to apply, this Court must find: (1) the commission of one of a list of specified felonies, which includes the offense conviction in this case, and (2) a specific intent requirement. In relation to the requirement of specific intent, there must be evidence that the underlying felony was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. §2332b(g)(5). While, the PSR recognizes the first element, it does not address the second. The Eighth Circuit has not directly addressed this issue, but the Fourth Circuit has addressed this two-part requirement.

In United States v. Chandia, the Fourth Circuit examined the requirements for the terrorism enhancement pursuant to §3A1.4(a) and concluded that application of the enhancement required specific findings by the district court that the defendant had acted with specific intent. 514 F.3d 365, 376 (4th Cir. 2008); United States v. Chandia, 675 F.3d 329, 331 (4th Cir. 2012) (reaffirming, the Court's previous ruling). Specifically, the Fourth Circuit found that for the §3A1.4(a) enhancement to apply, 18 U.S.C. §2332b(g)(5) requires the record to contain evidence that the defendant had specific intent to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. Chandia, 514 F.3d at 375-76.

2

The record in this case, is somewhat limited. The plea agreement provides the best source of facts. There, Mr. Mohamed admitted that:

> (a) From September 2007 through December 2007, the defendant assisted men from Minnesota with traveling to Somalia, so that the men could fight against Ethiopian troops who were in Somalia assisting the internationally-recognized Transitional Federal Government. The defendant knew that the men would commit acts in Somalia that would constitute the offense of murder, kidnapping, or maiming if committed in the United States.
>
> (b) The defendant's assistance included the following:
>
> > i. he attended meetings at a mosque, a restaurant, and a residence in Minneapolis, Minnesota in which the travel from Minnesota to Somalia to fight in combat against Ethiopian troops was discussed and planned.
> >
> > ii. he was present when men raised money to fund their travel; and
> >
> > iii. he assisted some of the men with obtaining their plane tickets and a false itinerary by accompanying them to a travel agency.

(Dkt. #122 at p. 2). The PSR confirms the facts of the plea agreement and adds a few additional details to the plea agreement facts.

Based on the record before this Court, there is nothing to suggest Mr. Mohamed acted with specific intent to target any government. There is no evidence Mr. Mohamed had anything to do with the men who traveled to Somalia after December 2007. While the PSR provides some background on al Shabaab there are some details missing that are relevant to Mr. Mohamed. In July 2011, the Center for Strategic & International Studies (CSIS) issued a report about al Shabaab. (*AL SHABAAB*, Rob Wise, July 2011, CSIS). The report details the modern history of Somalia's governmental chaos. It tracks the rise of the Islamic Courts Union in 2004, who, with the assistance of a small group within the

3

ICU, al Shabaab, eventually forced the warloads from Mogadishu in 2006.  The ICU's strict Islamic position concerned the majority-Christian Ethiopia and in December 2006, Ethiopia invaded Somalia.  As a result ICU's leadership fled.  Al Shabaab remained and began a guerilla war against the Ethiopian troops.  Reports of murder and rape of Somalis by the Ethiopian troops began to appear in early 2006.  The reports were confirmed in a June 2008, Amnesty International report.  (*Routinely Targeted Attacks on Civilians in Somalia*, June 2008, Amnesty International).  Spurred by the reports of brutal murders and rapes, the CSIS report found that al Shabaab's ranks swelled with an influx of young Somali men motivated by nationalistic wishes to defend their families and reclaim their country.  It was in this context that the men from Minnesota decided to travel to Somalia.

Additionally, as the PSR notes, it wasn't until February 26, 2008, months after Mr. Mohamed's involvement in these matters ceased, that the United States declared al Shabaab a terrorist organization.  As for al Shabaab's al Qaeda connection, that did not occur until February 2010, when al Shabaab announced its aligning of interests with al Qaeda.

It is inside of anarchy of Somalia's politics that this Court must discern whether Mr. Mohamed possessed a specific intent to act as a terrorist. (Mr. Mohamed also argues that because the word "government" is not specifically defined in 18 U.S.C. §2332b, that the Rule of Lenity requires this Court to conclude, based on the statute's delineated jurisdictional bases, that government refers to the United States Government.  18 U.S.C. §2332b(b).  Since, there is no evidence Mr. Mohamed's actions affected the United States Government, the enhancement is not applicable.)  Leaving aside issues of statutory

4

interpretation, Mr. Mohamed submits when he aided the men in 2007, to travel to Somalia his intent was to help fellow Somali citizens return to their homeland and defend fellow citizens from assault. While, that intent does not justify his actions, it also does not make him a terrorist. There is no evidence the men who traveled in 2007, intended to alter the course of any government. There intent, as the CSIS report concludes (and as the men who travelled testified at the trial of Mahamud Omar supports), was based on a nationalistic drive to aid their fellow Somali citizens. There is simply no evidence that from September 2007 through December 2007, Mr. Mohamed acted with a specific intent to influence the conduct of a government. At best, Mr. Mohamed, like so many in the Somali community, was tied up in a nationalistic desire to protect his fellow Somali citizens from atrocities.

## II.   OMER MOHAMED HAS NOT OBSTRUCTED JUSTICE. HE HAS ACCEPTED RESPONSIBILITY FOR HIS ROLE IN THIS OFFENSE.

The PSR finds that Mr. Mohamed obstructed justice after his sentencing, and as a result requires a 2-level increase in his guideline calculation and the elimination of a 3-level decrease for acceptance of responsibility. (PSR at ¶¶ 104-05). The basis of this dramatic turn of Mr. Mohamed's guidelines is based on this Court's conclusion that Mr. Mohamed has made a materially false statement to a U.S. Probation Officer regarding his involvement at ELMI, an Islamic school in Minneapolis.

Section 3C1.1 states:

> **Obstructing or Impeding the Administration of Justice**
>
> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.

The comments to §3C1.1 while lengthy are helpful in this case:

> 3. Covered Conduct Generally.—Obstructive conduct can vary widely in nature, degree of planning, and seriousness. Application Note 4 sets forth examples of the types of conduct to which this adjustment is intended to apply. Application Note 5 sets forth examples of less serious forms of conduct to which this enhancement is not intended to apply, but that ordinarily can appropriately be sanctioned by the determination of the particular sentence within the otherwise applicable guideline range. Although the conduct to which this adjustment applies is not subject to precise definition, comparison of the examples set forth in Application Notes 4 and 5 should assist the court in determining whether application of this adjustment is warranted in a particular case.
>
> 4. Examples of Covered Conduct.—The following is a non-exhaustive list of examples of the types of conduct to which this adjustment applies:
>
> (A)   threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;
>
> (B)   committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction;
>
> (C)   producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding;
>
> (D)   destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to

commence), or attempting to do so; however, if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it resulted in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender;

(E)   escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding;

(F)   providing materially false information to a judge or magistrate judge;
(G)   providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense;

(H)   providing materially false information to a probation officer in respect to a presentence or other investigation for the court;

(I)   other conduct prohibited by obstruction of justice provisions under Title 18, United States Code (e.g., 18 U.S.C. §§ 1510, 1511);

(J)   failing to comply with a restraining order or injunction issued pursuant to 21 U.S.C. § 853(e) or with an order to repatriate property issued pursuant to 21 U.S.C. § 853(p);

(K)   threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction.

This adjustment also applies to any other obstructive conduct in respect to the official investigation, prosecution, or sentencing of the instant offense where there is a separate count of conviction for such conduct.

5.   Examples of Conduct Ordinarily Not Covered.—Some types of conduct ordinarily do not warrant application of this adjustment but may warrant a greater sentence within the otherwise applicable guideline range or affect the determination of whether other guideline adjustments apply (e.g., §3E1.1 (Acceptance of Responsibility)). However, if the defendant is convicted of a separate count for such conduct, this adjustment will apply and increase the offense level for the underlying offense (i.e., the offense with respect to which the obstructive conduct occurred). See Application Note 8, below.

> The following is a non-exhaustive list of examples of the types of conduct to which this application note applies:
>
> (A)   providing a false name or identification document at arrest, except where such conduct actually resulted in a significant hindrance to the investigation or prosecution of the instant offense;
>
> (B)   making false statements, not under oath, to law enforcement officers, unless Application Note 4(G) above applies;
>
> (C)   providing incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation;
> (D)   avoiding or fleeing from arrest (see, however, §3C1.2 (Reckless Endangerment During Flight));
>
> (E)   lying to a probation or pretrial services officer about defendant's drug use while on pre-trial release, although such conduct may be a factor in determining whether to reduce the defendant's sentence under §3E1.1 (Acceptance of Responsibility).
>
> 6.   "Material" Evidence Defined.—"Material" evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination.

Of the examples given that illustrate conduct which the adjustment applies only example (H) could arguably apply. However, the other examples provide some guidance. The remaining examples are serious affronts to the administration of justice, (A) threatening witness, (B) suborning perjury, (C) creating false documents related to a judicial proceeding, (D) concealing evidence relating to a judicial proceeding, (E) escaping or fleeing custody, and generally providing false information that impedes an official investigation or prosecution. These are serious matters. What is not obstruction for this enhancement is providing incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation.

8

It is undeniable that Mr. Mohamed has always disclosed his involvement with ELMI to both Pre-Trial Services and the Government. Nevertheless, without conceding Mr. Mohamed ever provided misleading information to pre-trial services, and assuming this Court's determination that Mr. Mohamed provide incomplete or misleading information about his employment, Mr. Mohamed submits that omission or misleading information does not rise to the level of material evidence. Even if he was a leader at ELMI, that information does not materially change the situation. There was no testimony that Pre-Trial Services would have acted any differently had they known he was a leader at ELMI. That omission, if it were true, would not have tended to influence or affect any issue under determination before this Court. The requirements of the enhancement are not met and it should not be applied.

Without a finding of obstruction, there is nothing before this Court to suggest Mr. Mohamed has not accepted responsibility. He did not go to trial. He plead guilty. He admitted his role in the offense.

### III. SPECIFIC OBJECTIONS TO THE PRESENTENCE REPORT.

¶ 2: Mr. Mohamed denies he held a leadership role at the Essential Learning Minnesota Institute.

¶ 33: Mr. Mohamed denies he led discussions with Khalid Abshir.

¶ 35: Mr. Mohamed denies he planned to stay in Minnesota with Khalid Abshir to provide continued financial support. He in fact did not provide "continued" financial support.

¶ 36: Mr. Mohamed denies he made the decision about how and when the men would travel. He was present for the discussions, but did not make the decision.

¶ 41:   Mr. Mohamed denies convincing Shirwa Ahmed to join al Shabaab.

¶ 60:   Mr. Mohamed denies he organized the method of travel. He also denies he preached to others that joining al Shabaab was a religious obligation. Mr. Mohamed denies he sent money to "travelers". He has sent money to family members who live in Somalia and the Middle East.

## IV.   SECTION 3553(a) - THE CIRCUMSTANCES OF THE OFFENSE, THE HISTORY AND CHARACTERISTICS OF OMER ABDI MOHAMED

In keeping with the "new" requirements of sentencing, Mr. Mohamed reiterates what this Court knows, that the Supreme Court recognized the irrational nature of a strict application of the guidelines, when the Supreme Court stated in <u>Gall v. United States</u>, 128 S.Ct. 586 (2007), that "the Guidelines are not mandatory, and thus the range of choice dictated by the facts of the case is significantly broadened." <u>Gall</u>, 128 S.Ct. at 602 (citations omitted). <u>Gall</u> requires that in addition to considering the Guidelines, the "district court should…consider all of the 3553(a) factors to determine whether they support the sentence requested by the party. In so doing, he may not presume the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." <u>Gall</u>, 128 S.Ct. at 596-97 (citations omitted); <u>United States v. Miranda</u>, 505 F.3d 785, 791 (7th Cir. 2007)(stating "Although the guidelines are treated as advisory after Booker, the application of section 3553(a) is mandatory.")

The Supreme Court requires judges "to 'impose a sentence sufficient, but not greater than necessary to comply with' the basic aims of sentencing" in § 3553(a), <u>Rita v. United States</u>, 127 S.Ct. 2456, 2463 (2007), which include the need for the sentence "to

10

reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; to create adequate deterrence; to protect the public from further crimes of the defendant' and to provide the defendant with needed…medical care, or other correctional treatment in the most effective manner," 18 U.S.C. § 3553(a). Section 3553(a)(1) also gives sentencing courts "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" Gall, 128 S.Ct. at 596 n.6.

Omer Mohamed has committed a serious crime. He recognizes his ignorance of the law does not justify his crime. But, this Court can recognize the context that influenced Mr. Mohamed's actions can, and do mitigate the offense. The Somali diaspora in the United States and Minnesota have retained much of their traditional ways. The Somali Community here in Minnesota remains closely bound together. It is a Community that is proud to be both American and Somali. While America is home for Mr. Mohamed, like most in his Community, Somali continues to play a central role in his identity. It is a country he does not know well, but yet carries in the heart of his being.

Somalia is a country that has existed in a near perpetual state of anarchy since 1991. A country ravished by clan warfare and natural disaster. So, it is understandable that, when in 2006, Ethiopia invaded Somalia the Minnesota Somali diaspora took notice. Every Somali knows the long history of animosity between Ethiopia and Somalia. With hundreds of years of cultural dislike and reports of horrors committed in Somalia at the hands of the evading Ethiopian troops nationalistic passions rose in the Minnesota Somali Community.

11

It is inside of this context that young men from the Minnesota Somali community began to speak of returning to Somalia. The idea of returning was based on nationalistic passions to reclaim a homeland many of them never knew. The complexities of transnational politics never entered their minds. The men who travelled in 2007, where not radicalized by Islam to start a terror campaign, but mobilized by a sense of duty to an ideal they believed in: the idea of their homeland, Somalia.

Mr. Mohamed is not a radicalized Muslim. He is not a religious zealot that used religion to convince the men in 2007, to travel to Somalia. But, it is apparent that is the impression this Court has of Mr. Mohamed. As stated by the Court:

> This Court heard testimony during the trial of Mahamud Omar that described this Defendant's role in that conspiracy – that he had a leadership role and provided religious teachings to young me who traveled, and in some cases were killed, in Somalia, and that he directly facilitated the travel of one co-conspirator by obtaining a false itinerary to present to the co-conspirator's father. The government's proffer with respect to the activities connected to ELMI, and the Defendant's involvement with ELMI, demonstrates that the Defendant may be involved with or connected to continued attempts to facilitate the travel of young men from Minnesota to Somalia to fight with terrorist groups.

(Dkt. # 146 at pp. 12-13). With the greatest respect for the Court, the assessment of Mr. Mohamed is wrong. In an attempt to find a controlling force behind the events that resulted in the young men leaving Minnesota for Somalia, it appears this Court has determined Mr. Mohamed played a central role. Mr. Mohamed was not the leader of a conspiracy to indoctrinate and coerce young men into fighting for al Shabaab. And, the testimony from Mahamud Omar's trial simply does not prove he was.

Abdifatah Isse testified that he believed Mr. Mohamed had a leading role in 2007,

12

but then confirmed Mr. Mohamed was only involved in one meeting. Ahmed Mahamud testified the only reason he believed Mr. Mohamed was a "brother" was because he had been indicted. Salah Ahmed testified that Mr. Mohamed was not a leader, but somehow above those who traveled in 2007. Mr. Ahmed also testified that after the travelers arrived in Somalia they attempted to contact Mr. Mohamed, but he never answered. It was only Kamal Hassan who testified that Mr. Mohamed used the Quran and religion during the meetings to help convince him to travel to Somalia. And that was only during the Court's intensified questioning of the young man.

The Court is right to be concerned about the teaching of radical Islam to the Somali youth of Minnesota. But that concern should not include Mr. Mohamed. Mr. Mohamed is not an ongoing danger to the community. Quite the opposite, he is a positive asset. The over one hundred letters of support written on Mr. Mohamed's behalf don't reflect the man this Court believes him to be. He is not a radical Islamist with a mission to indoctrinate and provide new recruits for al Shabaab. He is a teacher in the Minnesota Somali Community. He has touched the lives of the hundreds. The proof of that assertion is not based on the words of cooperating defendants, but the hundreds of the Minnesota Somali Community that have taken the time to submit letters on Mr. Mohamed's behalf. Some of the letters provide just a word or two about their feelings for Mr. Mohamed:

> I know Omer Abdi Mohamed. And I didn't see or heard any problem he cause to this community and I believe he is a good man.
>
> I know Omar Abdi Mohamed for four year and I don't see any problem that he cause to this Community. I believe this person is nice and helpful

13

> person.  Who protect his country U.S.A. and he will never do any problem for this Country.

Others shared stories of the help he provided with schoolwork:

> I know Mr. Mohamed Omer since 2010 - present 2012 he is teacher of my children in Quran and help them to learn and also help offer school math and reading.  He is nice person and I never had any problems with him since I knew him.

> I met Omar Abdi Mohamed about a year ago when I was seventeen.  ELM Institute, is a wonderful place from my point of view.  I wanted to learn more about math.  Omar Abdi Mohamed was my math teacher and after I started attending ELM Institute I seen myself in love with math.  He made it very fun and knew how to explain it.  Now that I am in college I'm very thankful I got to meet Mr. Mohamed because he opened up many doors for me.

> I knew Mohamed Omer through the community.  He was a very peaceful person.  He was an active volunteer at the ELIM School.  I seen him many times smiling since he was going.  He is not violent person like they say about him.  We miss him and we want him back.  I hope you can release him.

Others still provide detailed stories of the impact Mr. Mohamed has had on their lives.  This Court may have believed the testimony of the cooperating defendants in Mahamud Omar's case, but the Minnesota Somali Community does not.  The Community sees Mr. Mohamed as a good young man.  A man they want to rejoin their Community.

Omer Mohamed committed a crime in 2007.  He knows that.  He has taken responsibility for his actions.  And, he and his family will suffer for his actions.  But, Mr. Mohamed is not a terrorist.  He is a good young man.  He deserves to be sentenced as the man the Minnesota Somali Community sees him to be.  The man he is.  He deserves to be returned to the family that loves him and the Community that cherishes him.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | **WOLD MORRISON LAW** |
| Dated: April 19, 2013. | s/ Peter B. Wold |
|  | Peter B. Wold, ID #118382 |
|  | Aaron J. Morrison, ID#341241 |
|  | 247 Third Avenue South |
|  | Minneapolis, MN  55415 |
|  | Telephone: 612.341.2525 |
|  | Facsimile:  612.341.0116 |