UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 09-352 (MJD/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S POSITION |
| v. | ) | WITH RESPECT TO SENTENCING |
| | ) | |
| OMER ABDI MOHAMED, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys B. Todd Jones, United States Attorney for the District of Minnesota, Assistant United States Attorney Charles J. Kovats, Jr., and Department of Justice Trial Attorney William M. Narus hereby submits its position with respect to sentencing of defendant Omer Abdi Mohamed ("Mohamed" or "defendant").   Pending any additional information that may be submitted to the Court, the government believes that a Guidelines sentence is appropriate in this case.

I.      **BACKGROUND ON SOMALIA.**

At Common Appendix I, the government presents a factual background on Somalia that is relevant to the sentencing proceedings against the following defendants:

*United States v. Mahamud Said Omar*, 09-CR-242 (MJD/FLN)
*United States v. Kamal Said Hassan*, 09-CR-38 (MJD/FLN)
*United States v. Salah Osman Ahmed*, 09-CR-50 (MJD/FLN)
*United States v. Abdifatah Yusuf Isse*, 09-CR-50 (MJD/FLN)
*United States v. Adarus Abdulle Ali*, 09-CR-317 (MJD/FLN)
*United States v. Omer Abdi Mohamed*, 09-CR-352 (MJD/FLN)
*United States v. Ahmed Hussein Mahamud*, 11-CR-191 (MJD/FLN)

This background is provided at Common Appendix I to the sentencing position papers filed in each of the cases described above.

## II.     A MINNESOTA PIPELINE OF SUPPORT TO SOMALIA.

At Common Appendix II, the government submits the description of the offenses, defendants, and facts and circumstances describing the conduct at issue.  Like Common Appendix I, Common Appendix II is an identical document submitted in each case described above.  The specific conduct of the defendant is set forth in more detail in Section III, B below.

## III.     THE CASE AGAINST THIS DEFENDANT, OMER ABDI MOHAMED

### A.     The Charge of Conviction

On July 18, 2011, the defendant pleaded guilty to Conspiracy to Provide Material Support to Terrorists, in violation of 18 U.S.C. § 2339A(a).  This offense carries a statutory maximum sentence of 15 years' imprisonment, a term of supervised release of life, a $250,000 fine, and a $100 special assessment.

### B.     The Defendant's Offense Conduct

#### 1.     *The Factual Basis in the Plea Agreement*

The parties agreed to the following in the factual basis of the the plea agreement:

> From September 2007 through December 2007, the defendant assisted men from Minnesota with traveling to Somalia, so that the men could fight against Ethiopian troops who were in Somalia assisting the internationally-recognized Transitional Federal Government.  The defendant knew that the men would commit acts in Somalia that would constitute the offenses of murder, kidnaping, or maiming if committed in the United States.

> The defendant's assistance included the following: (1) he attended meetings at a mosque, a restaurant, and a residence in Minneapolis, Minnesota in which the travel from Minnesota to Somalia to fight in combat against Ethiopian troops was discussed and planned; (2) he was present when men raised money to fund their travel; and he assisted some of the men with

2

obtaining their plane tickets and a false itinerary by accompanying them to a travel agency.

### 2.     The Facts Described in the PSR

As described in the PSR, the defendant planned and facilitated the travel of young men from Minneapolis to Somalia to fight the Ethiopian soldiers invited into Somalia by the TFG.   (PSR ¶ 60).   He attended secret meetings in which he encouraged men to fight and he helped facilitate and organized their travel to maintain operational security.   (*Id.*). In so doing, he obtained a fake itinerary which permitted Kamal Said Hassan (*See* Attachment 2, Number "3") to travel to Somalia to fight.   (*Id.*).   Finally, the defendant was known to "preach" to the men that fighting was a religious obligation they must satisfy. (*Id.*).

### 3.     The Testimony Adduced at the Trial of Mahamud Said Omar

Although the defendant denied "verbally encouraging" the men to travel to Somalia during his change of plea colloquy, the balance of evidence suggests otherwise.   In fact, the evidence demonstrates that the defendant was one of the leaders of the group.   During the trial of *United States v. Mahamud Said Omar*, 09-CR-242-MJD, the following evidence was adduced:

THE COURT:          Who was talking? Who was preaching? Who was the leader?

THE WITNESS:        When we had these meetings, Your Honor, it was Mohamed Omer that did most of the talking and Ahmed also mentioned.

BY MR. NARUS:

Q.                  Let's make sure we're perfectly clear, if I may, Your Honor. When you say Mohamed Omer, which letter or number are you referring to?

A.                He's AA, sir.

(*See* Common Appendix IV, Draft Trial Testimony of Kamal Said Hassan, at Bates 000015-000036).

As a leader, the defendant often was responsible for calling meetings together. The defendant called a particularly important meeting at the Ainu Shams restaurant so the would-be travelers could speak with "Adair" (*See* Attachment 1, Letter "A"), an al Shabaab facilitator and relation of Khalid Abshir (*See* Attachment 2, Number "7"):

Q.                Who was the leader or leaders who called that meeting?

A.                It was Mohamed Omar, AA, and Khalid, number 7.

Q.                Did they notify you by cell phone that it was going to happen?

A.                I think so.

Q.                All right. So when you -- when everyone gets there to Ainu Shams, who are all the people that are there?

A.                Sir, I was there. Salah, number 4 was there. Abdifatah was there. Number 6, Ahmed, was there. Khalid, number 7, was there.

Q.                Was Mohamed Omer, AA, there?

A.                Yes, sir.

(Hassan, at Bates 000243).

Q.                So who placed the telephone call to Somalia or did someone from Somalia call one of you?

A.                As I remember, we made the phone call to Somalia.

Q.                Who had the telephone number to call?

4

A.        I believe we used Mohamed Omar's cell phone, AA, to make that call.

Q.        Did he have the number programmed into his phone or did somebody give it to him?

A.        I don't remember that, sir.

Q.        In any event, you're all sitting in a circle, true?

A.        That's true.

Q.        And the connection is made to the person who's on the other end in Somalia?

A.        Yes, sir.

Q.        Tell us what you remember now about the conversation.   First tell us how you learned the name of the person who was being called.

A.        We learned the name of the person that was being called I think previously, prior to that meeting, and before the phone call was made either Mohamed Omer or Khalid, number 7, I'm not sure which one said that they were calling Adair.

Q.        Adair?

A.        Yep. And so the call was made and it was on speaker and Adair answered on the other end of the line.

Q.        And describe the conversation for us. First tell us who the people were who talked.

A.        The people that were talking were Mohamed Omar, AA, and Khalid, number 7.

(Hassan, at Bates 000245-000246).

The defendant not only provided his own leadership to the group, but he also provided religious instruction and motivation:

5

Q.        And Omer Abdi Mohamed, who you call Mohamed Omar, AA on the other chart, he was at that second meeting too, right?

A.        I think so, sir.

Q.        And he had a charismatic personality, right?

A.        He did, sir.

Q.        This guy could talk, right?

A.        Yeah, he was a good speaker.

Q.        He was articulate, true?

A.        Yep.

Q.        He knew the Quran backwards and forwards?

A.        Yes, sir.

Q.        And all the hadiths, right?

A.        Yes, sir.

Q.        So does the talk of jihad begin in this second meeting or had it already been discussed?

A.        Usually it was Mohamed Omar, AA, and number 6, Ahmed, they were the ones that usually, that brought that up, that subject up.

Q.        So at this second meeting there was lots of recitation of these verses from the Quran that talk about battle and war and that kind of thing?

A.        I don't remember if that happened at that meeting or not, sir.

Q.        In any event, there was talk about jihad?

A.        Yes, sir.

Q.        Talk about killing the kuffars already?

6

A.                    Yes, sir.

(Hassan, at Bates 000238-000239).

However, the defendant did not limit the group's exposure to only his religious instruction and motivation.   Indeed, the defendant also provided lectures by Anwar al-Awlaki:

Q.                    Do you remember any lectures that you listened to?

A.                    Yes, sir, we did.

Q.                    Which lectures did you listen to?

A.                    We listened to a lecture on jihad from Anwar Al-Awlaki.

Q.                    And who made you aware of this lecture?

A.                    Mohamed Omer know that, sir.

Q.                    When you say Mohamed Omar, which photograph are you referring to?

A.                    AA, this one, Exhibit 163.

(Hassan, at Bates 000013).

That the defendant was one of the leaders of this group was also proven by the testimony of Salah Osman Ahmed (*See* Attachment 2, Number "4"):

Q.                    Were there any leaders who were not pictured on this chart?

A.                    Yes.

Q.                    Who is that?

A.                    Another guy, his name was Mohamed Omer. He was not I won't say he was big leader, but he was above us.

7

(*See* Common Appendix IV, DRAFT Trial Testimony of Salah Osman Ahmed, at Bates 000022).

As Salah Ahmed testified, the defendant's leadership extended beyond merely motivation and religious instruction; the defendant also provided the group operational security measures to keep their plan from discovery, "I remember Khalid and Mohamed Omer, they say it's not good to all four of you to go in one airplane or something, you know, people might notice you, that you guys leaving or the mosque might notice that all four of you not here or -- I will say security purpose. I don't know why it was – I don't know why they were scared."   (Ahmed, at Bates 000032)

### 4.    *The Pertinent Guideline Calculations Agreed to By the Parties*

In the plea agreement, the parties agreed to the following Guideline calculations:

Base Offense Level, U.S.S.G. §§ 2A1.5, 2X1.1:  33    (Plea Agreement, para. 6(a))

Acceptance of responsibility, §§ 3E1.1(a), (b):    -3    (*Id.* para. 6(d))

The government reserved the right to argue that a 12-level adjustment under § 3A1.4(a) applies because the defendant's conviction is a crime of terrorism.   The defendant reserved his right to argue that this section did not apply.   (*Id.* para. 6(c)).

The defendant reserved the right to argue that a 2-level reduction under § 3B1.2(b) is appropriate because of the defendant's alleged "Minor Role" in the offense.   The government reserved the right to oppose this downward adjustment.   (*Id.*).

Finally, the parties agreed that if the adjustment under § 3A1.4(a) applies, the defendant's Criminal History Category would be VI.   Otherwise, the parties believed the defendant would be in Category I.   (*Id.* para. 6(f)).

## IV.    THE PSR's CALCULATIONS AND RECOMMENDATIONS.

On or about March 25, 2013, the United States Probation Office disclosed the PSR in this case. The PSR calculates defendant's applicable guideline range at 180 months' imprisonment, based on a total offense level of 47, criminal history category VI, and a statutory maximum sentence of 15 years' imprisonment.   (PSR ¶ 145).

The PSR guideline calculations are summarized as follows:

| | | |
|---|---|---|
| Base Offense Level, §§ 2X2.1/2A1.5(a):`           ` | 33 | (PSR ¶ 99) |
| Victim Related Adjustments:<br>Felony involving/promoting crime of terrorism § 3A1.4(a): | +12 | (PSR ¶ 102) |
| Adjustment for Obstruction of Justice, § 3C1.1: | +2 | (PSR ¶ 104) |
| Acceptance of responsibility, §§ 3E1.1(a), (b): | 0 | (PSR ¶ 105) |
| Total Offense Level: | 47 | (PSR ¶ 106) |
| Criminal History Category: | VI | (PSR ¶ 111) |
| Guideline Range: | 180 months | (PSR ¶ 145) |
| Supervised Release: | Up to life | (PSR ¶ 148) |
| Fine: | $25,000-$250,000 | (PSR ¶ 154) |

The PSR also indicates that the information provided does not constitute a recommendation by the USPO for a departure or a variance.

## V.    GOVERNMENT'S RESPONSE TO THE PSR.

### A.    Objections to the PSR

The government has no objections to the PSR.   However, as to the description of defendant Ahmed Abdulkadir Warsame (charged in the Southern District of New York)

9

located at paragraph 18 of the PSR, the government would like to add that on December 21, 2011, Ahmed Warsame pleaded guilty to all nine counts of the indictment. The information relating to Ahmed Warsame's pleas of guilty was not available at the time the PSR was published.

### B.    The Government's Guideline Calculations

The government agrees with the guideline calculations in the PSR. The government does not believe any other Specific Offense Characteristics or Victim-Related Adjustments are appropriate. The government also concurs that the appropriate guideline range is 180 months' imprisonment based on Total Offense Level of 43 and a Criminal History Category of VI.

### C.    The Terrorism Adjustment Under U.S.S.G. § 3A1.4(a) Applies

The defendant disputes the PSR's correct application of U.S.S.G § 3A1.4(a), the terrorism adjustment, which increases his Offense Level by 12 levels and his Criminal History Category to VI. The government concurs with the USPO that the terrorism adjustment should apply to this defendant's case.

#### 1.    *Text of the Terrorism Enhancement*

Section 3A1.4 is categorized under chapter three as a victim-related adjustment for terrorism. Section 3A1.4 was amended in 1996 by the Antiterrorism and Effective Death Penalty Act.

Section 3A1.4 states, in pertinent part, that:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

10

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

There are four application notes to Section 3A1.4. Application Note 1 states that the term "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5). Section 2332b states, in pertinent part:

(5) the term "Federal crime of terrorism" means an offense that–

(A)    is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B)    is a violation of –

(i)    . . . 956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad), . . . 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations) . . . .

Application Note 2 concerns harboring, concealing and obstruction of justice offenses. It states, "For purposes of this guideline, an offense that involved (A) harboring or concealing a terrorist who committed a federal crime of terrorism (such as an offense under 18 U.S.C. § 2339 or § 2339A); or (B) obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism."

Application Note 3, which concerns "Computation of Criminal History Category," provides that, "[u]nder subsection (b), if the defendant's criminal history category as determined under Chapter Four (Criminal History and Criminal Livelihood) is less than Category VI, it shall be increased to Category VI." USSG § 3A1.4 cmt. n.3 (2012).

11

Application Note 3 serves as an addendum to § 3A1.4's subsection (b) by clarifying that § 3A1.4 does not require a prerequisite criminal history category VI for its application. Application Note 3 provides for the automatic increase of criminal history to category VI. The increase applies to the § 3A1.4 application notes, except for Application Note 4.

Application Note 4 is a stand-alone provision for upward departure, rather than a Section 3A1.4 adjustment, in cases where the defendant's actions do not meet the definition of "federal crime of terrorism" as defined in 18 U.S.C. § 2332b(g)(5). The predetermined increases of offense level and criminal history category that are applicable to § 3A1.4 are not applicable to Application Note 4. The Commission noted that an upward departure rather than a specific guideline adjustment was used because of the infrequency of this type of case and so that the court could assess the harm caused by these offenses on a case-by-case basis.

Viewed in the aggregate, these amendments reflect an understanding by both the Congress and the Sentencing Commission that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." *United States v. Meskini,* 319 F.3d 88, 92 (2d Cir.), *cert denied sub nom. Haouari v. United States*, 538 U.S. 1068 (2003). "We have recognized that 'the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of

recidivism, the difficulty of rehabilitation, and the need for incapacitation.'" *United States v. Stewart,* 590 F.3d 93, 143 (2nd Cir. 2009) (quoting *Meskini, supra,* 319 F.3d at 92).

### 2.    Two Theories of Application of the Section 3A1.4 Enhancement

The disjunctive phrases in § 3A1.4 makes clear that the predicate offense must either (1) "involve" a federal crime of terrorism or (2) be "intended to promote" a federal crime of terrorism and that each clause has a separate meaning.   The United States has not been able to locate any Eighth Circuit precedent on the application of § 3A1.4.

### a.    The "Involve" a Federal Crime of Terrorism Theory

For § 3A1.4 to apply under this prong, the offense must have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," *and* the offense must be one of those enumerated in § 2332b(g)(5).    The government submits that the Court must determine by a preponderance of the evidence that the defendant's offense was "calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct." *United States v. Ashqar*, 582 F.3d 819, 824 (7th Cir. 2009) (preponderance of the evidence standard applies to consideration of the terrorism enhancement); *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010); *United States v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011).    The Court may draw reasonable inferences regarding the intent of defendant's crime based upon the evidence. *See United States v. Mohammed*, 693 F.3d 192, 201-02 (D.C. Cir. 2012) (affirming district court's application of the terrorism enhancement where the court "pointed to specific statements in the record – which Mohammed does not dispute he made – from which it [the district

13

court] drew plausible inferences); *United States v. Chandia*, 675 F.3d 329, 340-41 (4th Cir. 2012) (affirming application of terrorism enhancement where the court "reasonably inferred by a preponderance of the evidence" that the defendant intended to advance Lashkar's terrorist purpose in providing material support to a leader of Lashkar). Although the Eighth Circuit has not considered the issue of whether the district court must make specific factual findings in order to apply the terrorism enhancement, the government assumes for purposes of this sentencing memorandum that that the Eighth Circuit would follow the example of the Fourth Circuit. *See Chandia*, 675 F.3d at 334 (citing *Chandia I*, 514 F.3d 365, 376 (4th Cir. 2008) (if the sentencing court concludes that the terrorism enhancement is applicable, it was to "identify the evidence in the records that supports its determination").

> i.    ***"Calculated to influence or affect" conduct of government, or to "retaliate against" government conduct***

In *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010), the Second Circuit made clear that for the terrorism enhancement to apply, the law requires a showing only of a specific intent "to commit an offense that was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'" *Awan*, 607 F.3d at 317 (quoting 18 U.S.C. § 2332b(g)(5)). The Court has been clear, however, that the statute does *not* require "proof of the defendant's particular motive." *Id.* The defendant's "motive is simply not relevant." *Id.* "[A] person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation." *Id.* By way of example, "a person who

14

murders a head of state" commits an act of terrorism if he knows "that his crime will influence or affect the conduct of government . . . even if his particular motivation in committing the murder is to impress a more established terrorist with his abilities." *Id.* In a second example, the Court explained, "A hired assassin who kills a political leader at the behest of a terrorist organization can hardly disclaim that his crime was calculated to influence the conduct of government simply because he was motivated by greed rather than politics." *Id.* at 318.

> Thus, the Second Circuit went on to focus on the defendant's knowledge:
>
>> If the evidence showed that Awan engaged in criminal conduct *with knowledge that confederates solicited his actions* to effectuate politically motivated bombings in India, or homicidal attacks on that country's security forces or its political leaders, such proof could demonstrate that Awan's crimes were calculated to influence the conduct of government even if he was not personally motivated by that object.

*Id.* at 317-18 (emphasis added).

The Court noted that the "calculated to influence" language had been referred to by some courts as the "motivational element." The Court explained that, in fact, "the section is better understood as imposing a requirement that the underlying felony [be] calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct." *Id.* at 317 (citing *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009)).

The Eleventh Circuit stated that the Court's analysis "focuses on the intended outcome" of the defendant's crimes – "i.e., what the activity was calculated to accomplish, not what the defendant's claimed motivation behind it was." *Jayyousi*, 657 F.3d at 1115

15

(citations omitted); *cf. United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011) (applying the terrorism enhancement to defendant's conviction for supporting Hamas's fundraising arm because defendant knew Hamas had the goal of influencing government through violent jihad, and the evidence showed that defendant supported that goal).

### ii.    *"Conduct of Government" or retaliation for "Government Conduct"*

The "government" affected need not be the government of the United States. Courts have held that a Colombian terrorist group's attempt to influence the government of Colombia met the requirements of the statute.    *See United States v. Puerta*, 249 Fed.Appx. 359, 360 (5th Cir. 2007) (*per curiam*) (The court found that § 2332b(g)(5) applied to "Puerta and his co-conspirators [who] sought to trade drugs and money for weapons to supply the United Self Defense Force[s] of Colombia, a designated foreign terrorist organization that opposes the Colombian government."); *United States v. DeAmaris*, 406 F. Supp. 2d 748 (S.D. Tex. 2005) (concluding "the word 'government' as used in § 2332b(g)(5)(A) includes foreign governments and is not limited to the government of the United States" and applying the enhancement to a group opposed to the government of Colombia).    Courts have also applied the enhancement with respect to Egypt and Pakistan. *See Stewart*, 590 F.3d at 144 (quoting without disapproval the district court's application of the terrorism enhancement to a defendant whose conduct was "calculated to affect the conduct of the Egyptian government though intimidation and coercion"); *United States v. Aref,* No. 04-CR-402, 2007 WL 804814, at 2 (N.D.N.Y. Mar. 17, 2007) (finding enhancement applied to conduct calculated to influence or affect President of Pakistan).

16

The Sixth Circuit applied the enhancement to Hizballah's attempts to influence Israel, disregarding a defense argument that Israel no longer constituted a "government" because it was occupying Lebanon in contravention of international law. *United States v. Assi*, 428 Fed. Appx. 570, 574-75 (6th Cir. 2011). There, the defendant was accused of attempting to provide global positioning satellite modules, night vision goggles, and a thermal imaging camera to a terrorist organization, Hizballah. The Court explained, "Surely Congress did not intend for a United States district court judge to determine whether a foreign state is complying in full with its international obligations before determining whether a person who has pled guilty to providing support to a foreign terrorist organization is subject to § 3A1.4." *Id.* at 575.

### iii.  *The Offense Need Not Be Violent*

In *Assi,* the Sixth Circuit also responded to a defense argument that his crime was not violent. The Court observed that, "Not all of the crimes listed in 18 U.S.C. § 2332b(g)(5)(B) are necessarily violent," citing as examples "1030(a)(1) (relating to protection of computers)," "1030(a)(5)(A) resulting in damage as defined in 1030(c)(4)(A)(i)(II) through (VI) (relating to protection of computers)," "1361 (relating to government property or contracts)," and "1362 (relating to destruction of communication lines, stations, or systems)." *Assi,* 428 Fed. Appx. At 574. Thus, the Sixth Circuit adhered to the plain language of the statute and found "that a non-violent offense can be a federal crime of terrorism." *Id.* The Sixth Circuit held that the terrorism enhancement was not limited to acts of violence; a nonviolent offense could qualify as a "federal crime of terrorism" as defined by 18 U.S.C. § 2332b(g)(5). *Id.*

17

### b.    The "Intended to Promote" Theory

The Second Circuit has noted that by using the term "intended to promote" the terrorism enhancement casts a "broader net" than the statutory definition alone.    *Stewart,* 590 F.3d at 137.   In order to satisfy the requirements of the terrorism enhancement, "[t]he criminal conduct at issue need not itself meet the statutory definition of a federal crime of terrorism if 'a goal or purpose [of the defendant's act] was to bring or help to bring into being a crime listed in'" the statutory definition.   *Id.* (quoting *United States v. Mandhai*, 374 F.3d 1243, 1247 (11th Cir. 2004).   Thus, the "intended to promote" theory applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism."   Therefore, in order to apply under the "intend to promote" theory of applicability, "the defendant's offense need not itself be 'calculated' as described in Section 2332b(g)(5)(A)."   *Id.*

The Seventh Circuit has upheld the application of § 3A1.4 in a case under the "intended to promote" theory in *United States v. Ashqar.*   In that case, the defendant was called before a grand jury and advised the grand jury was investigating alleged terrorist acts of Hamas.   *Ashqar*, 582 F.3d at 821.   Once before the grand jury, the defendant refused to answer the questions posed to him by the Assistant United States Attorney.   *Id.* The defendant was subsequently convicted of obstruction of justice and criminal contempt.[1]   *Id.*   At sentencing, the district court applied § 3A1.4 and sentenced the

---

[1] The defendant was also charged with a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) based on his refusals to testify but was acquitted of these offenses.   *Ashqar* at 822.

defendant to 135 months' imprisonment. *Id.* In upholding the district court's application of § 3A1.4, the Seventh Circuit held the defendant's conduct before the grand jury, namely obstructing an investigation "can be one way of promoting" a federal crime of terrorism. *Id.* at 826. The Court continued,

> Promoting a crime includes helping and encouraging that crime, and one way of furthering a crime is to try to prevent the government from finding out about it. So long as the sentencing court finds that the defendant intended to obstruct an investigation into a federal crime of terrorism, as opposed to an investigation into more ordinary violations of the law, the court has found the intent required to apply § 3A1.4.

> *Id.*

### 3.    Applicability of Section 3A1.4 to the Defendant

In the present case, the defendant's crime involved a federal crime of terrorism and satisfies the first theory of applicability of § 3A1.4. First, the defendant was convicted of Conspiracy to Provide Material Support to Terrorists, in violation of 18 U.S.C. § 2339A, an offense among those enumerated in § 2332b(g)(5)(A). Second, the defendant's crime was calculated to influence or affect the conduct of the government, specifically, the government of Ethiopia and the Transitional Federal Government of Somalia.

#### a.    The Defendant's conduct involved an enumerated "Federal Crime of Terrorism" found at § 2332b(g)(5)(B)(i)

On July 18, 2011, defendant Mohamed entered a guilty plea to participating in a Conspiracy to Provide Material Support to Terrorists, in violation of 18 U.S.C. § 2339A. According to 18 U.S.C. § 2332b(g)(5)(B), the offense to which the defendant pleaded guilty is a "Federal Crime of Terrorism" and plainly satisfies the first element of § 3A1.4.

19

### b.    The Defendant's offense was calculated to influence or affect the conduct of government by intimidation and coercion and to retaliate against government conduct

The defendant's commission of the offense was also "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and, therefore, satisfies the second and final element of § 3A1.4.

### i.    Plea Agreement and Plea Colloquy

As demonstrated by the facts stipulated to by the parties in the plea agreement, the defendant's underlying conduct, and the trial testimony of Kamal Hassan and Salah Ahmed, his actions were certainly calculated to have such influence or effect. The defendant knew the men he was helping send to Somalia would commit unlawful acts of violence against Ethiopian soldiers and the TFG; in fact, the defendant knew these acts of violence would constitute murder if committed in the United States.

Further, Kamal Hassan testified that before he left he understood that he and the members of his group would be fighting against the Ethiopian military forces present in Somalia. During the meeting called by the defendant at Ainu Shams, "Adair" told them about different battles and different ambushes that his group did in Somalia against Ethiopian troops. (Hassan at Bates 000016).

In sum, "element one" is satisfied because the offense for which the defendant was convicted, a violation of 18 U.S.C. § 2339A, is a "federal crime of terrorism." "Element two" is satisfied because of the defendant's admitted role in the offense, his knowledge and support of the goals of the members of his conspiracy. His statements and actions leave no ambiguity regarding his intention to mobilize young men from Minnesota to deploy

them to Somalia where they could kill Ethiopians.   Thus, one can only conclude that his conduct was intended and calculated "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."   As such, the "terrorism adjustment" under § 3A1.4 must apply.

## V.   ABSENT ANY ADDITIONAL MOTIONS, THE COURT SHOULD SENTENCE THE DEFENDANT TO A GUIDELINE SENTENCE.

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence.   552 U.S. at 49-50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors").

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented."   *Id.* at 50. If the court determines that a sentence outside of the Guidelines is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."   *Id.*   Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the

public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

### A.    Nature and Circumstances of the Offense.

As described in the plea agreement, the defendant participated in a conspiracy to send men from Minnesota to Somalia so they could kill members of the Ethiopian armed forces. The defendant did so knowing that the violence to be done in Somalia, if done in the United States, would constitute the crime of murder. The defendant played no small role in the fall of 2007. He was one of the initial members of the conspiracy in Ramadan 2007 and possessed superior knowledge of Islam, which he called upon at meetings and in conversations to justify the actions of the departing men. He provided an Anwar al-Awlaki lecture to Kamal Hassan and Salah Ahmed and encouraged them to listen to it. The lecture, entitled "Constants on the Path of Jihad," encourages men to violent jihad. He used a contact at a travel agency to book the tickets for the four travelers and employed operational security by having them travel in pairs and book return flights despite the fact that they would not be returning as scheduled. Finally, the defendant secured a false itinerary for Kamal Hassan to use to deceive his parents into providing his passport so that he could travel to Somalia. Put simply, the defendant enabled the recruits, assisted with fundraising by attending events, and provided any religious justification they needed for the trip.

The nature and seriousness of the defendant's crime of conspiring to provide support to those who seek to kill Ethiopian soldiers weigh strongly in favor of a Guidelines sentence in this case. *See* 18 U.S.C. § 3553(a)(1) and (a)(2)(A).

22

**B.      History and Characteristics of Defendant.**

As recounted in the PSR, the defendant emigrated to the United States in 1995 and graduated from high school in Burnsville, Minnesota in 2000.   He was gainfully employed from 2007 until his arrest.   The defendant has not been convicted of any offenses.   He is in a cultural marriage with two children and is expecting a third.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

The defendant played an important role in the first wave of men from Minneapolis to leave for Somalia to fight and attempt to kill the Ethiopian troops occupying Somalia at the request of the TFG.   The insertion of American citizens and lawful permanent residents into a conflict overseas is of an exceptionally serious nature.   As the facts have demonstrated, the group with which the Minnesota recruits fought was aligned with al Qaeda and engaged in horrific acts of violence against civilians to include suicide bombings.

Further, although the defendant has no appreciable criminal history and this offense represents his first criminal conviction, his participation in this criminal conspiracy cannot be viewed as a discrete event occurring at a singular place and time.   His attendance at a meeting of criminal confederates, his provision of money, plane tickets and a false itinerary, and his loyalty to the members of the conspiracy encompass many months.   The government respectfully asks the Court to consider a substantial term of imprisonment to reflect the seriousness of the offense and to promote respect for the law.

**D.      The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant.**

In this case, there is a need for both individualized and general deterrence. Individualized deterrence is that which discourages a defendant from ever committing such a crime again.  General deterrence is the public response necessary to deter other people from committing similar crimes.  "Congress specifically made general deterrence an appropriate consideration  . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)).

Terrorists and terrorist organizations rely upon support from individuals for their success in carrying out specific attacks, as well as their continued existence.   The sentence imposed in this case needs to deter individuals from believing that they can sit at a safe distance, lend support to the violent aims of terrorists and terrorist organizations, and be free from detection or punishment.   In the District and State of Minnesota, which has seen a proliferation of cases involving young men traveling to join al Shabaab, this is no small interest.   To date, neither the designation of al Shabaab as a foreign terrorist organization nor prosecution of the men who joined al Shabaab and those who have supported them, have completely stemmed the flow of support to the foreign terrorist organization from Minnesota.   The government respectfully requests the Court strongly consider the impact on both this defendant and the broader community when imposing an appropriate sentence.

Further, the harm that those who finance international terrorism cause is of grave concern.  *Humanitarian Law Project,* 130 S.Ct. at 2724 (upholding the constitutionality of

§2339B: "the Government's interest in combating terrorism is an urgent objective of the highest order."). A substantial sentence is necessary to deter individuals, like the defendant, from believing that simply because they do not pick up a gun or attend a training camp, they do not facilitate terrorism. As the Supreme Court has recognized:

> 'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups – legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds – all of which facilitate more terrorist attacks.

*Id.* at 2725.

A Guidelines sentence in this case would appropriately send a message to the community at large that the United States does not tolerate such abhorrent criminal conduct. Given the compelling need to deter the continued threat that home-grown terrorists and those that support them pose to the United States and our allies, a Guidelines sentence would send a clear message that such conduct is not tolerated by the U.S. government.

### E.    The Kinds of Sentences Available, the Need to Avoid Disparities and the Sentencing Guidelines and Related Policy Statements.

Within the last three years, numerous defendants have been sentenced in federal district court for providing, or attempting to provide, material support to a conspiracy to kill, or support to al Shabaab, or related offenses. At Common Appendix III, the Court will find a short description of each case, the offense(s) of conviction, and the sentence handed down by the respective district courts.

Within the current cases pending sentencing before this Court, the government believes the Court should note the following aggravating facts that could serve to distinguish this defendant from some of the other defendants, (1) the defendant played a leadership role in the offense; (2) the defendant did not plead guilty until the eve of trial, and (3) the defendant's pretrial release was revoked.

The Guideline sentencing range for the offense to which the defendant pleaded guilty would be life imprisonment but for the limitation provided by the 180-month statutory maximum. Absent any motion from the government related to the defendant's sentence, the government believes that a sentence within the Guideline range is appropriate and necessary to satisfy the factors described in 18 U.S.C. § 3553(a).

Dated: April 19, 2013                    Respectfully Submitted,

                                         B. TODD JONES
                                         United States Attorney

                                         s/ John Docherty for
                                         _____
                                         CHARLES J. KOVATS, JR.
                                         Assistant United States Attorney

                                         s/ William M. Narus
                                         _____
                                         WILLIAM M. NARUS
                                         Trial Attorney
                                         U.S. Department of Justice